UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| DEBORAH A. SIERRA, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | CAUSE NO.: 2:14-CV-298-TLS |
|  | ) |  |
| CAROLYN COLVIN, | ) |  |
| Acting Commissioner of the Social | ) |  |
| Security Administration, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**OPINION AND ORDER**

The Plaintiff, Deborah A. Sierra, seeks review of the final decision of the Commissioner of the Social Security Administration denying her application for Disability Insurance Benefits (DIB). The Plaintiff protectively filed her DIB application on March 21, 2012, alleging disability beginning on July 3, 2007. Her date last insured is March 31, 2012. The application was denied on May 29, 2012, and denied again upon reconsideration on June 25, 2012. At the Plaintiff's request, an ALJ held a hearing on May 3, 2013, at which the Plaintiff—who was represented by an attorney—and a vocational expert (VE) both testified.[1] On May 15, 2013, the ALJ found that the Plaintiff has the following impairments: multiple sclerosis (MS), degenerative disc disease of the cervical spine, and obesity. However, she ultimately concluded that the Plaintiff is not disabled. The Plaintiff requested review of the ALJ decision, and on July 1, 2014, the Appeals Council denied the Plaintiff's request for review. On August 22, 2014, the Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

---

[1] In a pre-hearing brief, the Plaintiff amended the alleged onset date of disability to March 4, 2011, the date of her fiftieth birthday.

BACKGROUND

The Plaintiff is 55 years old and lives with her husband. She has a high school diploma, and has worked almost continuously from high school until late 2007. She last worked as a school cafeteria worker on a part-time basis (i.e., 20 hours per week).

A.  **Medical Evidence**

On July 3, 2007, the Plaintiff consulted her primary care physician, Dr. Mark McMurtrey, after experiencing numbness in her left arm and hand. Shortly thereafter, the Plaintiff was referred for an MRI (magnetic resonance imaging), which showed several lesions that supported a diagnosis of MS.[2] On July 10, 2007, the Plaintiff was evaluated by a neurologist, Dr. George Abu-Aita. His notes indicate that numbness in the Plaintiff's left arm and hand "come[s] and goes, but the tingling doesn't go away from the hand . . . [and a]t times she feels off balance when she gets up temporarily without any falls." (R. 395.) Dr. Abu-Aita also noted the Plaintiff's history of chronic mid and lower back pain, and ordered an MRI of the cervical spine, which was performed on July 20, 2007. The MRI showed mild bulging annulus at the C5-6 vertebral level, and a subtle central disc bulge/protrusion at the C6-7 vertebral level. In August 2007, the Plaintiff saw Dr. Abu-Aita again, and this time, she complained of numbness in the left side of her face and left wrist. Dr. Abu-Aita prescribed intravenous steroid medication

---

[2]As described by the Mayo Clinic, MS is "a potentially disabling disease of the brain and spinal cord . . . [where] the immune system attacks the protective sheath (myelin) that covers nerve fibers and causes communication problems between your brain and the rest of your body. Eventually the disease can cause the nerves themselves to deteriorate or become permanently damaged. Signs and symptoms of MS vary widely and depend on the amount of nerve damage and which nerves are affected . . . There's no cure for multiple sclerosis."
http://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/home/ovc-20131882 (last visited March 23, 2016).

(Solu-Medrol), and diagnosed the Plaintiff as possibly having MS.

The Plaintiff returned to Dr. Abu-Aita on February 5, 2009. According to his notes, the Plaintiff alleged that she was feeling better until December 2008, when she began experiencing symptoms of fatigue; balancing issues that resulted in falling; and numbness, especially in her left hand. Another MRI was performed on February 20, 2009, which showed findings consistent with MS. Dr. Abu-Aita again prescribed Solu Medrol, but his notes from June 23, 2009, indicate that the Plaintiff's MS-related symptoms improved, although her numbness persisted.

On October 23, 2009, another MRI of the cervical spine was ordered following the Plaintiff's complaints of pain in her neck, shoulders, and arms. The MRI showed increased degeneration of the cervical discs. On October 27, 2009, Dr. Abu-Aita referred the Plaintiff for physical therapy, but the Plaintiff elected to defer treatment because she was feeling better. On January 19, 2010, the Plaintiff returned to Dr. Abu-Aita with complaints of fatigue; and on June 20, 2011, the Plaintiff presented complaints of pain in her left ankle, swelling in her left leg, and numbness in her left foot and heal.

Then, in October 2012, Dr. Amjad Safvi (radiologist) performed an MRI of the Plaintiff's lower back. According to his report, the MRI detected "[e]arly degenerative change in the lumbar spine with disc disease at the L4-L5 [spinal] levels." (R. 446–47) ("At L4-L5, there is annular tear in the posterior aspect of the disc. 3.5 mm diffuse posterior disc bulge along with bilateral facet and ligamentum flavum hypertrophy results in bilateral neural foraminal encroachment and abuts the exiting L4 nerve roots."). An MRI of the Plaintiff's neck also showed a "[d]egenerative change in the cervical spine with disc disease at the C4-C5 to C-6-C7 spinal levels." (R. 449–450) ("At C4-C5, 3 mm diffuse posterior disc bulge abuts the cervical

cord . . . [a]t C5-C6, 4 mm broadbased paracentral disc protrusion abuts the cervical cord . . . [a]t C6-C7, subtly diffuse posterior disc bulge without significant central canal foraminal stenosis."). An MRI of the Plaintiff's brain was also conducted, showing "areas of signal abnormality." (R. 448) (finding signal abnormalities "in the bilateral preiventricular white matter and left corona radiata most likely represent[ing] chronic microangiopathic ischemic" and "[w]hite matter plaque that can be seen with multiple scleroris.") The Plaintiff followed up with Dr. Abu-Aita on November 27, 2012, and complained of numbness in her legs, balancing issues, and continuing back and neck pain.

### B.     Plaintiff's Testimony

At the ALJ hearing on May 3, 2013, the Plaintiff described her daily experience with alleged pain in her back, neck, shoulders, and arms. In particular, the Plaintiff testified that her "back usually kills [her] every day," and that it hurts "more and more" as the day progresses. (R. 34–35.) According to the Plaintiff, her back pain prevents her from lifting more than a gallon of milk, standing for more than a half-hour, or walking more than short distances (e.g., a walk around the grocery store). When asked to rate her pain level on a scale of one to ten, the Plaintiff said "[s]ometimes 15." (R. 41.) Although the Plaintiff was prescribed pain medication, she stopped taking it because it made her tired and "not functional." (R. 47.) As an alternative remedy, the Plaintiff said she takes "lots of Advil." (R. 41.)

The Plaintiff also described her daily experience with MS, which she attributes as the source of her fatigue, balancing issues, and problems with the use of her hands (i.e., picking up or handling small items such as buttons or zippers). *See also* R. 157, Pl.'s Third Party Function

Report, Apr. 24, 2012 ("[I] can't use my hands [and] arms like I could, they don't have strength in them."). During her testimony, the Plaintiff placed particular emphasis on her legs, which she described as "really unstable." (R. 32.)

The Plaintiff testified that although Dr. Abu-Aita treated her MS from 2007 to 2009, she skipped treatment in 2010 and 2011 due to cost considerations:

> [I]t's because my husband's insurance changed at work. And I pretty much have to pay for everything out of my pocket . . . [a]nd it's not cheap. So that's why I kind of put off [those] two years going and seeing [Dr. Abu-Aita]. Then [Dr. Abu-Aita] wants me to go get the steroids [to treat my MS]. I would love to go back and get the steroids again but I have to pay for that out of pocket. I have to pay if I went on the shots he wants me to do . . . when you have to pay for all that, that's not something easy to do.

(R. 44–45).[3] In light of her alleged physical pain and MS-related symptoms, the Plaintiff testified that she feels "relatively good" only one to two days per week. (R. 50.)

## C. ALJ Decision (Five-Step Evaluation)

The Social Security regulations set forth a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. *See* 20 C.F.R. § 404.320(b)(2); 42 U.S.C. § 423(a)(1)(A) (a disability finding requires relevant evidence that the claimant is disabled before his or her date last insured); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v); § 423(d)(1)(A) (defining a disability under the Social Security Act as being unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

---

[3]It appears that the Plaintiff continued to skip treatment in 2012 due to cost considerations. *See* R. 190 (stating in her social security filings that Dr. Abu-Aita conducted MRIs in 2012 and he noted that "spots are still on my brain . . . [he] wanted me to start shots, but I told him I wasn't going to because of the cost to me.").

5

has lasted or can be expected to last for a continuous period of not less than 12 months.");
§ 423(d)(2)(A) (an applicant must show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."). The first step is to determine whether the claimant is engaged in substantial gainful activity (SGA). Here, the ALJ found that the Plaintiff was not engaged in SGA from her alleged onset date of March 4, 2011, through her date last insured of March 31, 2012, so the ALJ moved on to the second step, which is to determine whether the claimant had a "severe" impairment or combination of impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).[4] The ALJ determined that, through her date last insured, the Plaintiff had the following impairments: MS, degenerative disc disease of the cervical spine, and obesity. However, the ALJ ultimately determined that the Plaintiff did not have a "severe" impairment or combination of impairments under 20 C.F.R. § 404.1521(a); and therefore, concluded that the Plaintiff did not have a disability at any time from the alleged onset date of March 4, 2011, through her date last insured of March 31, 2012.

## STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). A

---

[4]Because of the Plaintiff's age at the alleged onset date of disability, education, and prior, unskilled work experience, to be found disabled, the Plaintiff must show that she is limited to no more than sedentary-level work. *See* 20 C.F.R. Part 404, Subpart P, App. 2.

court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.*

The ALJ is not required to address every piece of evidence or testimony presented, but the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). If the Commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

ANALYSIS

On appeal, the Plaintiff contends that remand is necessary; in large part, because the ALJ, in determining that the Plaintiff did not have a disability at any time from the alleged onset date of March 4, 2011, through her date last insured of March 31, 2012, failed to consider or discuss medical records that post-dated the Plaintiff's date last insured. The Plaintiff also argues that the ALJ improperly discredited her testimony about her functional limitations. The Court will address each issue in turn.

A.  Medical Evidence Post-Dating March 31, 2012

As noted above, a disability finding requires relevant evidence that the claimant is disabled before his or her date last insured. *See* 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. § 404.320(b)(2); *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011). However, in making this finding, an ALJ must consider "all evidence in the administrative record," 20 C.F.R. § 404.1520(a)(3), including evidence arising after the date last insured. *Doherty v. Astrue*, No. 1:11–cv–00838–DML–TWP, 2012 WL 4470264, at *5 n.2 (S.D. Ind. Sep. 27, 2012) (citing *Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008)).

On similar facts to the present case, the Seventh Circuit found in *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984), that the ALJ committed reversible error, in part, by giving little, if any, consideration to medical records post-dating the claimant's date last insured, without regard to whether such records shed light on the claimant's disability during the relevant time period. *Id.* at 1225–26 (finding that "evidence must not be viewed in isolation."); *Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) (finding that "[m]edical evaluations

made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's [date last insured].") (citation omitted); *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005) (finding that "the ALJ must consider evidence that post-dates the relevant period to the extent that it corroborates or supports the evidence from the relevant period") (citing *Halvorsen*, 743 F.2d at 1255 ("There can be no doubt that medical evidence from a time subsequent to a certain period can be relevant to a determination of a claimant's condition during that period.")); *cf. Eichstadt*, 534 F.3d at 667 (finding that the ALJ did not fail to consider post-dated evidence because she "examined it as required and subsequently concluded that the evidence was irrelevant" because it failed to support the plaintiff's claim.).

As the Plaintiff correctly notes—and the Commissioner appears to admit—the ALJ's decision lacks any real indication that the medical evidence post-dating March 31, 2012, was considered in making the disability determination.[5] Notably, such post-dated evidence includes 2012 MRIs of the Plaintiff's brain, lower back, and neck—each of which bears a direct relation to the Plaintiff's relevant impairments (i.e., MS and degenerative disc disease of the cervical spine) and may shed light on the Plaintiff's condition during the relevant time period. *See* R. 446–47, Dr. Safvi Report, Oct. 16, 2012 (detecting an "[e]arly degenerative change in the lumbar spine with disc disease at the L4-L5 levels."); R. 449–450, Dr. Safvi Report, Oct. 16, 2012 (detecting a "[d]egenerative change in the cervical spine with disc disease at the C4-C5 to C-6-C7 levels." ); R. 448, Dr. Safvi Report, Oct. 16, 2012 (detecting "areas of signal

---

[5]Although the ALJ began her decision by stating that "[a]fter careful consideration of all the evidence, the undersigned concludes the [Plaintiff] was not under a disability" (R. 11), such language has been routinely criticized as "meaningless boilerplate." *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016) (quoting *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (citations omitted)).

abnormality" in the Plaintiff's brain).

The Commissioner—without addressing *Halvorsen* or any other cases supporting its proposition—contends the ALJ did not commit reversible error because she was not required to discuss every piece of evidence in the record. (Resp. 11 (citing *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)). While it is certainly true that the ALJ was not required to discuss each piece of evidence in the record, she was, nevertheless, required to consider the administrative record holistically. *Halvorsen*, 743 F.2d at 1225–26 (finding that "evidence must not be viewed in isolation."). Thus, any failure on her part to consider post-dated evidence that "corroborates or supports the evidence from the relevant period" constitutes reversible error. *Blom*, 363 F. Supp. 2d at 1059 (citing *Halvorsen*, 743 F.2d at 1255).[6]

On remand, the ALJ must consider all of the evidence in the administrative record—including evidence post-dating the Plaintiff's last date insured—and reassess whether the Plaintiff has an impairment that significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

**B.   Credibility Determination**

The Plaintiff also contends that the ALJ improperly discredited her testimony about her

---

[6]The Court also rejects the Commissioner's alternative argument that the ALJ's failure to discuss post-dated evidence constituted harmless error because the Court "'can predict with great confidence what the result on remand will be.'" (Resp. 11 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).) Absent the ALJ's consideration of post-dated evidence that may shed light on the Plaintiff's condition during the relevant time period, the Court cannot conclude that the ALJ provided a "logical bridge" between the evidence and the conclusions. *Terry*, 580 F.3d at 475; *see also McKinzey v. Astrue*, 641 F.3d at 892 (warning that the harmless error standard is not "an exercise in rationalizing the ALJ's decision and substituting our own hypothetical explanations for the ALJ's inadequate articulation."); *see also Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2011) (criticizing the government's over-reliance on the doctrine of harmless error in the social security context).

functional limitations. As the Seventh Circuit has repeatedly held, an ALJ is in the best position to determine the credibility of witnesses, and a credibility determination will be overturned only if it is patently wrong. *Craft*, 539 F.3d at 678; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *see also Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). To evaluate credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. The ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and functional limitations. *Simila v. Astrue*, 573 F.3d 503, 517 (citing 20 C.F.R. § 404.1529(c)(2)–(4) and *Prochaska*, 454 F.3d at 738).

Here, the ALJ found "that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 15.) The ALJ based this conclusion, in large part, on the lack of "objective evidence during the period under consideration." (*Id.*)

Notwithstanding the ALJ's failure to consider all of the objective medical evidence in the

11

record, the Seventh Circuit has cautioned that an individual's statements about the intensity and persistence of pain or about the effect the pain has on his ability to work may not be disregarded solely because they are not substantiated by objective medical evidence. *Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014) (citing SSR 96-7p); *see also Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("Even when . . . the claimant attributes her pain to a physical rather than a psychological cause, the administrative law judge cannot disbelieve her testimony solely because it seems in excess of the objective medical testimony.") (quotation marks and citation omitted); *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) (stating that the governing "regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding"); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (finding that an ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." (quotation marks and citation omitted)); *Clifford v. Apfel*, 227 F.3d 863, 871–72 (7th Cir. 2000).

> With respect to the other factors to consider, the Seventh Circuit has instructed that:
>
> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (citations omitted).

Although the ALJ solicited details of the Plaintiff's activities and the extent to which the Plaintiff could perform those activities without experiencing pain, it appears that she also based her credibility determination on the Plaintiff's lack of treatment for her medically determinable impairments. *See, e.g.*, R. 15 ("[D]espite her allegations of multiple scleroris, [the Plaintiff] testified that she 'skipped' treatment with her neurologist in 2010 and 2011."). Citing SSR 96–7p, 1996 WL 374186, the Plaintiff correctly notes that an ALJ cannot weigh gaps in treatment records without determining the reason for those gaps. *Thomas v. Colvin*, 534 F. App'x 546, 2013 WL 4106366, at *5 (7th Cir. Aug. 13, 2013) ("[A]n ALJ must consider reasons for a claimant's lack of treatment (such as an inability to pay) before drawing negative inferences about the claimant's symptoms.") (citing *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013)); *see also* SSR 96–7p, 1996 WL 374186, at *7 ("the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment"). As SSR 96-7p notes, "[t]he explanations provided by the individual may provide insight into the individual's credibility." 1996 WL 374186, at *7.

Unmentioned by the ALJ, the Plaintiff has provided repeated explanations for her treatment gaps: a lack of financial resources to obtain regular treatment, particularly for MS. *See, e.g.*, R. 44–45 ("I pretty much have to pay for everything out of my pocket . . . [and the treatment is] not cheap. So that's why I kind of put off [those] two years going and seeing [Dr. Abu-Aita]."); R. 90 ("[Dr. Abu-Aita] wanted me to start shots, but I told him I wasn't going to

13

because of the cost to me."). Failure to obtain treatment because "the individual may be unable to afford treatment and may not have access to free or low-cost medical services," SSR 96–7p, 1996 WL 374186, at *8, is expressly cited by the Social Security Agency as an example of a legitimate explanation excusing a claimant's failure to seek treatment, *Roddy*, 705 F.3d at 638. *See also Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (citing SSR 96–7p, 1996 WL 374186, at *8) ("Inability to pay for medication or negative side effects from medication may excuse failure to pursue treatment.").

Accordingly, on remand, the ALJ must consider the Plaintiff's legitimate explanation for her treatment gaps. Moreover, as required by 20 C.F.R. § 404.1527(c)(2), the ALJ must offer a more developed discussion as to her credibility determination. While the ALJ need not provide "an exhaustive factor-by-factor analysis" of the checklist of factors under § 404.1527(c)(2), *Francis v. Comm'r Soc. Sec. Admin.*, 414 Fed. App'x. 802, 804 (6th Cir. 2011), the ALJ must nevertheless afford the Court meaningful review by discussing other factors—aside from objective medical evidence—that may serve as a sufficient basis for her determination that the Plaintiff's testimony was not fully credible.

## CONCLUSION

For the reasons stated above, the decision of the ALJ is REVERSED and REMANDED for proceedings consistent with this Opinion.

SO ORDERED on March 23, 2016.

    s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION